IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-71

No. 186A21

Filed 17 June 2022

IN THE MATTER OF: M.K.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) (2019) from an order entered 9 March 2021 by Judge J.H. Corpening, II, in District Court, New Hanover County. This matter was calendared for argument in the Supreme Court on 13 May 2022 but was determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Jane R. Thompson for petitioner-appellee New Hanover County Department of Social Services.*

*Poyner Spruill LLP, by Stephanie L. Gumm, for appellee Guardian ad Litem.*

*Benjamin J. Kull for respondent-appellant mother.*

ERVIN, Justice.

Respondent-mother Onika G. appeals from the trial court's order terminating her parental rights in her minor child M.K.[1,2] After careful consideration of respondent-mother's challenges to the trial court's termination order in light of the

---

[1] M.K. will be referred to throughout the remainder of this opinion as "Marco," which is a pseudonym used for ease of reading and to protect the juvenile's identity.

[2] The trial court also terminated the parental rights of Marco's father, Keshawn B., in Marco. In view of the fact that he did not note an appeal from the trial court's termination order, the father is not a party to the proceedings before this Court.

record and the applicable law, we conclude that the trial court's order should be affirmed.

## I.    Background

Marco was born in January 2019 and has two older siblings, M.N., who was born in 2014, and M.G., who was born in 2017.   The New Hanover County Department of Social Services had been attempting to help Marco's family address issues relating to mental health, domestic violence, parenting, and housing stability since May 2018, at which time the father of M.N. and M.G. had obtained the entry of a domestic violence order of protection against respondent-mother after she threatened him with a brick.   In August 2018, respondent-mother was charged with assaulting a woman.   Respondent-mother struggled to maintain housing and had moved multiple times.   After completing a comprehensive clinical assessment on 14 November 2018, respondent-mother was diagnosed as suffering from mild persistent depressive disorder and intermittent explosive disorder, with the assessor having recommended that respondent-mother participate in outpatient therapy, medication management, transition management services, and "individual placement" to "support[ ] employment."   However, respondent-mother failed to cooperate with the assessor's recommendations and only made minimal progress in attempting to comply with a case plan that had been developed for her by DSS.

On 22 February 2019, respondent-mother and Marco were staying with respondent-mother's aunt in New Hanover County. At 5:00 a.m. on that date, law enforcement officers responded to a domestic violence report originating from the aunt's residence. At the time that the officers arrived, respondent-mother had been locked out of her aunt's house and was arguing with her aunt through the door. The children were present during the incident, at the conclusion of which the officers arrested respondent-mother based upon outstanding warrants for failing to appear in court and violating a domestic violence order of protection. On the same date, DSS filed a juvenile petition alleging that Marco was a neglected juvenile and obtained the entry of an order placing him in nonsecure custody.[3]

After a hearing held on 27 March 2019 following respondent-mother's release from pretrial detention on 22 March 2019, the trial court entered an order finding, based upon the evidence presented on that occasion and certain stipulations between the parties, that Marco was a neglected juvenile as defined in N.C.G.S. § 7B-101(15). Although the trial court found that respondent-mother had failed to cooperate with the recommendations that had been made during her clinical assessment, it also

---

[3] Although the two older children were also the subject of the initial neglect proceeding and were involved in certain other juvenile proceedings discussed in the text of this opinion, we will refrain from discussing the proceedings relating to M.N. and M.G. any further given that they were later placed in their father's custody and were not subjects of the termination proceeding that is before us in this case.

found that she had agreed with the assessor's recommendations and wished to pursue a plan of reunification. As a result, the trial court ordered respondent-mother to

> complete a psychological evaluation and comply with any and all recommendations. She shall comply with any and all recommendations received from her substance abuse treatment provider. She shall seek medication treatment from one medication provider and consume all medication as prescribed. She shall submit to random drug screens as requested by [DSS] and [the] Guardian ad Litem. She shall execute a release on behalf of [DSS] and Guardian ad Litem with all service providers. She shall obtain stable housing and verifiable income.

¶ 5 At a review hearing held on 5 June 2019, a report describing the results of a psychological evaluation conducted by Len Lecci, Ph.D., which had been completed on 1 May 2019, was admitted into evidence. Dr. Lecci diagnosed respondent-mother as suffering from bipolar II disorder and recommended that she receive a medication assessment, behavioral intervention, Dialectical Behavior Therapy group work, and one-on-one parenting education and that she apply for Section 8 housing assistance and social security disability benefits. At the time of the 5 June 2019 review hearing, respondent-mother lacked independent housing and was not employed. In a review order entered on 9 July 2019, the trial court found that respondent-mother had applied for social security disability benefits and Section 8 housing assistance and had expressed the intention to pursue medication management. The trial court authorized respondent-mother to have supervised visitation with Marco for two hours each week and allowed DSS to increase the frequency and duration of the respondent-

mother's visits with Marco to the extent that respondent-mother complied with the provisions of her case plan.

¶ 6    After a permanency planning hearing held on 6 February 2020, the trial court entered an order on 27 February 2020 in which it determined that respondent-mother was utilizing mental health services provided by the Physician Alliance for Mental Health (PAMH).  On the other hand, the trial court found that respondent-mother denied that she had any responsibility for her untreated mental health difficulties and her lack of stable housing and that respondent-mother's "unwillingness to act on her own behalf [wa]s a significant barrier" to her ability to satisfy the requirements of her case plan.  In addition, the trial court noted that DSS had concerns about respondent-mother's "ability to keep herself and her child[ ] safe"; observed that respondent-mother had "made threats of violence towards others;" described "accounts of physical violence towards others" and had made "videos of fights"; and pointed out that, even though respondent-mother had been authorized to have weekly supervised visitation with Marco, she had only done so "sporadically," having participated in six of the ten visits that had been scheduled between November 2019 and the date of the permanency planning hearing.  Finally, the trial court noted that respondent-mother had met with DSS employees on 24 January 2020, that respondent-mother had acknowledged that she had a substance abuse problem at that time, and that, after acknowledging that she would test positive for marijuana,

respondent-mother had refused to comply with a request that she submit to a random drug screen. In light of these and other findings of fact, the trial court ordered respondent-mother to comply with the terms of her case plan and established a primary permanent plan for Marco of reunification, with a secondary plan of adoption.

¶ 7      On 30 November 2020, the trial court entered another permanency planning order in the aftermath of a hearing that was held on 4 November 2020. At that time, the trial court determined that respondent-mother had failed to make adequate progress towards satisfying the requirements of her case plan within a reasonable amount of time. More specifically, the trial court determined that respondent-mother had consistently failed to engage in the services that had been recommended for her during the psychological evaluation that had been performed by Dr. Lecci and that her "unwillingness to act on her own behalf" continued to pose a significant barrier to her ability to satisfy the requirements of her case plan. The trial court also found that respondent-mother's "unwillingness to address her anger management issues continue[d] to put [Marco] at risk of harm" and posed yet another barrier to reunification.

¶ 8      The trial court found that respondent-mother had completed a comprehensive clinical assessment with PAMH in January 2020 and that PAMH had recommended that she receive a Community Support Team level of care. The trial court found that,

after respondent-mother had been placed on a waiting list for such services, CST had contacted respondent-mother in May 2020 for the purpose of addressing her "immediate stressors" — housing and employment. The trial court further noted that respondent-mother did not have a mental health treatment plan and that PAMH was not addressing respondent-mother's medication management or mental health therapy needs at that time.

¶ 9    The trial court determined that, by August 2020, respondent-mother was in the process of obtaining a psychiatric evaluation and transitioning her medication management to PAMH. The trial court noted that respondent-mother had made contradictory reports to social workers concerning the medications that she had been taking and that, while respondent-mother claimed that she had been taking her psychotropic medication as prescribed, she had been unable to identify the medication in question. The trial court found that, despite the fact that DSS and the guardian ad litem had repeatedly contacted PAMH for the purpose of obtaining information about the treatment that respondent-mother had been receiving, neither had received a response. In light of this set of circumstances and respondent-mother's failure to respond to inquiries that DSS had made to respondent-mother about her treatment, the trial court found that respondent-mother had "intentionally withh[eld] treatment information from [DSS] and [the] Guardian ad Litem."

¶ 10    Similarly, the trial court found that respondent-mother had failed to consistently submit to random drug screens in accordance with DSS requests and that visitation with respondent-mother had become a "negative experience" for Marco. Aside from the fact that she had only attended sixteen of thirty-three scheduled visits, respondent-mother had failed to exhibit appropriate parenting skills during the visits in which she did participate and had been unable to participate in needed one-on-one parenting instruction given her failure to consistently visit with Marco. Based upon these and other findings, the trial court determined that respondent-mother was "acting in a manner inconsistent with [Marco's] health and safety," ordered that termination of respondent-mother's parental rights in Marco be pursued, required respondent-mother to comply with the requirements of her case plan, and changed Marco's permanent plan to a primary plan of adoption and a secondary plan of reunification.

¶ 11    On 7 December 2020, DSS filed a petition seeking the termination of respondent-mother's parental rights in Marco on the basis of neglect, N.C.G.S. § 7B-1111(a)(1) (2021), and willfully leaving Marco in a placement outside of the home for more than twelve months without showing reasonable progress toward correcting the conditions that had led to Marco's removal from her care, N.C.G.S. § 7B-1111(a)(2) (2019). After conducting a hearing concerning the issues raised by the termination petition on 1, 8, and 11 February 2021, the trial court entered an order on 9 March

2021 in which it found, among other things, that respondent-mother had had a fourth child, named R.T. in August 2020 and that respondent-mother had experienced ongoing domestic violence involving R.T.'s father since R.T.'s birth. In its termination order, the trial court found that both of the grounds for termination alleged in the termination petition existed and that termination of respondent-mother's parental rights would be in Marco's best interests. Respondent-mother noted an appeal to this Court from the trial court's termination order.

## II.    Analysis

¶ 12        A termination of parental rights proceeding consists of an adjudicatory stage and a dispositional stage. *See* N.C.G.S. § 7B-1109, -1110 (2019). During the adjudicatory stage, the trial court is required to determine whether any of the grounds for terminating a parent's parental rights delineated in N.C.G.S. § 7B-1111 exist, *see* N.C.G.S. § 7B-1109(e), with the petitioner having the obligation to establish the existence of any applicable grounds for termination by clear, cogent, and convincing evidence, *see* N.C.G.S. § 7B-1109(f). "We review a district court's adjudication under N.C.G.S. § 7B-1111(a) to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re J.S.*, 374 N.C. 811, 814 (2020) (cleaned up) (quoting *In re N.P.*, 374 N.C. 61, 62–63 (2020)). "Findings of fact not challenged by respondent are deemed supported by competent evidence and are binding on appeal." *In re B.R.L.*,

379 N.C. 15, 2021-NCSC-119, ¶ 11 (quoting *In re T.N.H.*, 372 N.C. 403, 407 (2019)).

"A trial court's finding of fact that is supported by clear, cogent, and convincing

evidence is deemed conclusive even if the record contains evidence that would support

a contrary finding." *In re A.L.*, 378 N.C. 396, 2021-NCSC-92, ¶ 16 (quoting *In re

B.O.A.*, 372 N.C. 372, 379 (2019)). " '[T]he issue of whether a trial court's adjudicatory

findings of fact support its conclusion of law that grounds existed to terminate

parental rights pursuant to N.C.G.S. § 7B-1111(a)' is reviewed de novo by the

appellate court." *In re M.R.F.*, 378 N.C. 638, 2021-NCSC-111, ¶ 7 (alteration in

original) (quoting *In re T.M.L.*, 377 N.C. 369, 2021-NCSC-55, ¶ 15). "Under a *de novo*

review, the court considers the matter anew and freely substitutes its own judgment

for that of the trial court." *In re T.M.L.*, 377 N.C. 369, 2021-NCSC-55, ¶ 15 (cleaned

up) (quoting *In re C.V.D.C.*, 374 N.C. 525, 530 (2020)). "[A]n adjudication of any

single ground for terminating a parent's rights under N.C.G.S. § 7B-1111(a) will

suffice to support a termination order." *In re M.S.*, 378 N.C. 30, 2021-NCSC-75, ¶ 21

(quoting *In re J.S.*, 374 N.C. at 815).

**A. Findings of fact**

In the brief that she filed before this Court, respondent-mother begins by

arguing that portions of the following findings of fact lack sufficient evidentiary

support:

> 8. During the ongoing services treatment case in
> 2018, [respondent-mother] struggled to maintain stable

housing for herself and her children. Housing instability remained an issue at [Marco]'s birth in 2019, and [respondent-mother] moved multiple times and between counties. She resided in domestic violence shelters in Wake County and Pender County prior to [Marco]'s removal. She was involuntarily discharged from a domestic violence shelter in Pender County due to her behaviors and subsequently relocated to New Hanover County where she resided with a relative.

9. On February 22, 2019, law enforcement responded to a 911 call regarding a domestic violence incident at 5:00 a.m. [Respondent-mother] was locked out of [a] maternal aunt['s] home, and [the maternal aunt] would not allow her into the home. [Respondent-mother] and [the maternal aunt] . . . argued through the door, and [respondent-mother] threatened to kill [the maternal aunt]. Law enforcement responded. The children were present during the incident. Respondent-mother had outstanding warrants for failure to appear and violation of a domestic violence protection order, and she was arrested.

. . . .

11. [Respondent-mother] failed to focus on making an appropriate plan for her children and was only focused on getting released from jail.

. . . .

16. At the inception of [Marco]'s foster care case, [respondent-mother] entered into a Family Services Agreement that included obtaining and maintaining stable housing, obtaining and maintaining verifiable employment, submitting to a psychological evaluation, submitting to random drug screens and maintaining an executed release with all service providers on behalf of [DSS] and [the] Guardian ad Litem.

17. [Respondent-mother] has failed to maintain safe and suitable housing for herself and [Marco] for any prolonged period of time. She has resided with various relatives including [the maternal aunt], [the maternal grandmother] and the maternal grandfather. [Respondent-mother] obtained independent housing for a short period of time with the assistance of [PAMH] and the Back @ Home Program. She obtained a lease agreement for a residence [on] . . . 9th Street, Wilmington, North Carolina. The lease term was from August 2020 to July 31, 2021. She failed to maintain this residence due to ongoing domestic violence with [R.T.'s father]. After leaving the . . . house, she resided at a hotel with the assistance of Open Gate due to a domestic violence incident.

18. [Respondent-mother] recently relocated to . . . S. Kerr Avenue, Wilmington, North Carolina. She occupies one bedroom in the home, while she shares the living room, kitchen and laundry area with two unidentified males. She does not like her current living arrangement and is seeking alternate housing. She is currently behind on her rent payments.

. . . .

20. [Respondent-mother] failed to complete her application for Social Security Benefits as recommended in her psychological evaluation, however, she plans to apply in the near future. Caseworkers at SSI/SSDI Outreach, Access and Recovery (SOAR) and staff with PAMH will be assisting in filling out the required paperwork.

21. Domestic violence remains a barrier to reunification.

22. [Respondent-mother] acknowledged pulling a knife on [M.N. and M.G.'s father] in December 2019. During the altercation, [respondent-mother] was stabbed and sustained injuries requiring staples in her head.

23. [Respondent-mother] has been involved in a relationship with [R.T.'s father] for many years. Their relationship has been riddled with domestic violence since the birth of [respondent-mother]'s daughter in August 2020. [R.T.'s father] has spat on [respondent-mother], choked her and cut her forehead and face. She had altercations with a boyfriend in May 2020, July 2020, July [sic] 2020 and September 2020. In December 2020, [R.T.'s father] busted windows out and kicked the door in at her home.

. . . .

27. On May 1, 2019, [respondent-mother] completed a psychological evaluation with [Dr. Lecci]. During her evaluation with Dr. Lecci, she reported difficulty maintaining employment. She has been fired from every job she obtained. She acknowledged the need for medication management, however, at the time of the evaluation and for months thereafter, she failed to take medication to address her mental health issues. She obtained a Full Scale IQ of 77. This IQ score is described as borderline to low average cognitive functioning. She has intact intellectual capacities, but some of her biggest weaknesses are verbal ability and working memory. Her weaknesses will likely result in her presenting as less cognitively intact and can lead to functional problems.

. . . .

29. [Respondent-mother] failed to consistently address her mental health needs throughout [Marco]'s case. Eleven months into [Marco]'s foster care case, [respondent-mother] finally engaged with [PAMH]. In January 2020, PAMH began assisting [respondent-mother] with obtaining stable housing as it was her most immediate basic need. No additional therapeutic were provided at that time.

. . . .

31. [Respondent-mother] is engaged with the [CST] at PAMH. Danielle Dest, MSW, LCSW is the [CST] Lead. Ms. Dest has monthly contact with [respondent-mother]. The frequency in which [respondent-mother] is seen is dependent on her current need and circumstances. [Respondent-mother] has frequent contact with multiple professionals employed by PAMH. Ms. Dest has used DBT techniques in her interactions with [respondent-mother]. PAMH is not offering DBT groups during the COVID-19 pandemic so [respondent-mother] is not currently involved in DBT groups. [Respondent-mother] is engaged weekly by staff to address specific treatment goals. [Respondent-mother]'s years of involvement in the system as a child and young adult have created a mistrust which has been a challenge to overcome in her treatment. Much of PAMH staff's time with [respondent-mother] revolves around crisis management.

. . . .

38. During visitations with [Marco], [respondent-mother] was observed being verbally abusive to [Marco] during at least seven visits attended. She has been observed mocking [Marco], calling him names and telling him she is leaving the visits due to his behavior. She was observed by [DSS] calling [Marco] "fat," "weak," and "soft." She often talks on her cellphone during the visit while [Marco] cries unattended or entertains himself. [Respondent-mother] is unable to appropriately parent for two hours. [DSS] has been unable to expand visitation as to frequency, duration or level of supervision due to [respondent-mother]'s lack of progress.

We will analyze each of respondent-mother's challenges to the sufficiency of the evidentiary support for these findings of fact in turn.

As an initial matter, respondent-mother asserts that the statements in Finding of Fact No. 8 that she "was involuntarily discharged from a domestic violence shelter in Pender County due to her behaviors" and that she "resided in domestic violence shelters in Wake County and Pender County prior to Marco's removal" conflicted with the record evidence. At the termination hearing, Joshua Barton, a social worker employed by DSS, testified that, before Marco was taken into nonsecure custody, respondent-mother "had been in shelters in Wake County and Pender County." In addition, the trial court took judicial notice of the orders that had been previously entered with respect to the children, *see In re A.C.*, 378 N.C. 277, 2021-NCSC-91, ¶ 17 (stating that "a trial court may take judicial notice of findings of fact made in prior orders, even when those findings are based on a lower evidentiary standard[,] because[,] where a judge sits without a jury, the trial court is presumed to have disregarded any incompetent evidence and relied upon the competent evidence," (first alteration in original) (quoting *In re T.N.H.*, 372 N.C. 403, 410 (2019)), with the 22 April 2019 adjudication and disposition order having noted, based upon a stipulation between the parties, that respondent-mother had been "involuntarily discharged from a domestic violence shelter in Pender County." As a result, while the record does contain evidence tending to support most of the information contained in Finding of Fact No. 8, we are unable to identify any support for the trial court's finding that respondent-mother had been involuntarily discharged from the Pender

County shelter "due to her behaviors," and will disregard this portion of Finding of Fact No. 8 in determining whether the trial court's findings support its conclusion that respondent-mother's parental rights in Marco were subject to termination. *In re J.M.J.-J.*, 374 N.C. 553, 559 (2020) (disregarding adjudicatory findings of fact not supported by clear, cogent, and convincing evidence).

¶ 15          Next, respondent-mother argues that the statement contained in Finding of Fact No. 9 that she "threatened to kill" her aunt lacks sufficient evidentiary support. Once again, we agree that the record does not contain evidence tending to show that respondent-mother threatened to kill the aunt at the time of the incident that ended in respondent-mother's arrest and Marco's placement in foster care. For that reason, we will disregard the trial court's determination that respondent-mother "threatened to kill" her aunt on that occasion in evaluating the extent to which the trial court's findings support its conclusion that respondent-mother's parental rights were subject to termination. *See In re J.M.J.-J.*, 374 N.C. at 559.

¶ 16          In addition, respondent-mother asserts that the trial court's statement in Finding of Fact No. 11 that, following her arrest on 22 February 2019, respondent-mother "failed to focus on making an appropriate plan for her children and was only focused on getting released from jail" has insufficient support in the evidentiary record. At the termination hearing, Mr. Barton testified that he spoke with respondent-mother at the New Hanover County jail on the day of her arrest for the

purpose of discussing "her children and what she wanted to do as far as placement." According to Mr. Barton, "[respondent-mother's] main focus [during that conversation] was getting out of jail" given that "[s]he felt like she was getting out of jail that day and going to her mother's residence." Although respondent-mother argues that the fact that "[h]er main focus" was on getting out of jail does not support a finding that release from incarceration was her "only" focus, "it is well-established that a district court 'ha[s] the responsibility to pass[ ] upon the credibility of the witnesses and the weight to be given their testimony and the reasonable inferences to be drawn therefrom.' " *In re A.R.A.*, 373 N.C. 190, 196 (2019) (alterations in original) (quoting *In re D.L.W.*, 368 N.C. 835, 843 (2016)). After carefully examining Mr. Barton's testimony, we conclude that it supports the trial court's inference that, following her arrest on 22 February 2019, respondent-mother "was only focused on getting released from jail." *See In re A.L.*, ¶ 16; *In re A.R.A.*, 373 N.C. at 196. Thus, we hold that respondent-mother's challenge to the sufficiency of the record support for Finding of Fact No. 11 lacks merit.

¶ 17        In the same vein, respondent-mother argues that the description of her case plan contained in Finding of Fact No. 16 as requiring that she obtain and maintain "stable housing" is not supported by the record evidence. In attempting to persuade us of the merits of this contention, respondent-mother points to testimony by George Colby, a DSS social worker, describing respondent-mother's case plan as requiring

that she obtain "safe and appropriate" housing and contends that "safe and appropriate" housing is not the same thing as "stable" housing. However, the trial court ordered respondent-mother to obtain "stable" housing in the 22 April 2019 adjudication and disposition order, the 9 July 2019 review order, and the 27 February 2020 permanency planning order. *See In re A.C.*, ¶ 17. As a result, we hold that the trial court's description of respondent-mother's case plan as requiring her to obtain "stable" housing has sufficient record support.

¶ 18        In addition, respondent-mother contends that the trial court erred by stating in Finding of Fact No. 16 that her case plan required her to obtain "verifiable employment" in light of the fact that Mr. Colby testified that respondent-mother's case plan mandated that she obtain "[l]egal income which would have at any point included social security." In respondent-mother's view, the trial court's finding that her case plan required her to obtain "verifiable employment" "improperly disregard[s] the contemplated option that her income could take the form of social security benefits." We note, however, that the trial court stated in its 27 February 2020 permanency planning order that respondent-mother should "comply with the terms of her Family Services Agreement[ ] . . . [and] obtain and maintain . . . verifiable employment." *See In re A.C.*, ¶ 17. In addition, the record contains no evidence tending to show that respondent-mother ever received social security benefits. As a

result, we hold that respondent-mother's remaining challenge to Finding of Fact No. 16 lacks merit as well.

¶ 19        Similarly, respondent-mother argues that the trial court erroneously stated in Finding of Fact No. 17 that, "[a]fter leaving the 9th Street house, she resided at a hotel with the assistance of Open Gate" on the grounds that the record contains no evidence tending to show that respondent-mother resided at a hotel during this period of time. However, the record reflects that the term of respondent-mother's lease at the 9th Street residence ran from August 2020 until 31 July 2021, that Mr. Colby testified that respondent-mother had utilized the services of Open Gate to find housing in September 2020, and that, after respondent-mother moved out of the 9th Street residence, Mr. Colby "picked [respondent-mother] up from a motel" that he thought "was likely provided by Open Gate but I was not aware of that at the time." In addition, Melissa Ellison, who served as Marco's guardian ad litem, testified that respondent-mother's residential history included periods during which she lived at "various hotels" using assistance provided by Open Gate. In light of this evidence, the trial court's inference that respondent-mother resided in a hotel after vacating her residence on 9th Street has ample record support. *See In re A.L.*, ¶ 16; *In re A.R.A.*, 373 N.C. at 196.

¶ 20        Furthermore, respondent-mother argues that the trial court's statement in Finding of Fact No. 18 that she "is currently behind on her rent payments" is devoid

of evidentiary support on the theory that the record only reflected that her rent was one month, rather than multiple months, in arrears. A careful review of the record reflects that, when asked if respondent-mother was able to make or was current on her rent payments, Ms. Dest with the CST team at PAMH testified that "I know that [respondent-mother] is late currently on a payment" by about a month "give or take." As a result, while we agree with respondent-mother that the record evidence does not tend to show that she was more than one month behind on her rent payments, we further conclude that the evidence does suffice to support a determination that respondent-mother was behind on her rent payments. *See In re A.L.*, ¶ 16. For that reason, we hold that this aspect of respondent-mother's challenge to the trial court's termination order lacks merit.

¶ 21        Moreover, respondent-mother challenges the sufficiency of the evidentiary support for the trial court's statement in Finding of Fact No. 20 that she "failed to complete her application for Social Security Benefits." In arguing that the record does not contain evidence tending to show that she "failed to complete her application," respondent-mother directs our attention to the orders that the trial court entered on 9 July 2019 and 30 November 2020 finding that respondent-mother had applied for social security disability benefits. In addition, we note that respondent-mother testified at the termination hearing that she had submitted her disability application and that, according to Dr. Lecci, her application had been

approved. Finally, the record reflects that Ms. Dest testified that respondent-mother's application for social security benefits had been referred to SOAR, a nonprofit advocacy organization that "supports an individual who is applying for disability," and described respondent-mother's application for social security disability benefits as "a work in process." Thus, given that the record does not contain any evidence tending to show that respondent-mother had "failed to complete her application for Social Security Benefits," we will disregard this portion of Finding of Fact No. 20 in determining whether the trial court's findings of fact support a determination that her parental rights in Marco were subject to termination. *See In re J.M.J.-J.*, 374 N.C. at 559.

¶ 22        Similarly, respondent-mother challenges the trial court's statement in Finding of Fact No. 21 that "[d]omestic violence is a barrier to reunification" on the grounds that this statement is, in reality, a conclusion of law or an ultimate finding of fact that has no legitimate bearing upon the issue of whether her parental rights in Marco were subject to termination. In view of the fact that respondent-mother has not contended that the challenged portion of Finding of Fact No. 21 lacks sufficient record support, that finding is binding upon us for purposes of appellate review. *See In re B.R.L.*, ¶ 11 (stating that "[f]indings of fact not challenged by respondent are deemed supported by competent evidence and are binding on appeal"). As a result, we will address respondent-mother's contentions concerning the relevance of her domestic

violence-related problems in the portion of this opinion that discusses the extent to which respondent-mother's parental rights in Marco were subject to termination.

¶ 23    In addition, respondent-mother argues that the trial court's statement in Finding of Fact No. 22 that she had "acknowledged pulling a knife on [M.N. and M.G.'s father] in December 2019" was not supported by the evidentiary record. At the termination hearing, the guardian ad litem testified that the father of M.N. and M.G. had sought to obtain a domestic violence order of protection against respondent-mother after "she had pulled a knife on him and his family." In discussing this aspect of the guardian ad litem's testimony, respondent-mother testified that "[t]hat was around the time that [the guardian ad litem] said I pulled a knife to him which . . . had to be December of 2019." Although the record does contain evidence tending to show that respondent-mother had threatened the father of M.N. and M.G. with a knife, it does not indicate that she ever acknowledged having done so. For that reason, we will disregard the portion of Finding of Fact No. 22 stating that respondent-mother had acknowledged pulling a knife on M.N. and M.G.'s father in determining whether the trial court's findings support a conclusion that her parental rights in Marco were subject to termination. *In re J.M.J.-J.*, 374 N.C. at 559.

¶ 24    Next, respondent-mother argues that the trial court's statement in Finding of Fact No. 23 that she "has been involved in a relationship with [R.T.'s father] for many years" lacks sufficient record support given that the challenged finding implies that

she continued to be involved in a romantic relationship with R.T.'s father at the time of the termination hearing. At the termination hearing, respondent-mother testified that she had been involved in a romantic relationship with R.T.'s father "ever since [she] was [fourteen years old]" and that, while the two of them were "together" at the time of Marco's birth, their relationship had ended by the time that respondent-mother gave birth to R.T. in 2020. As a result, given the absence of any evidence tending to show that respondent-mother continued to be romantically involved with R.T.'s father at the time of the termination hearing, we will disregard Finding of Fact No. 23 to the extent that it can be construed to mean that the relationship between respondent-mother and R.T.'s father was ongoing at the time of the termination hearing in determining whether respondent-mother's parental rights in Marco were subject to termination. *In re J.M.J.-J.*, 374 N.C. at 559.

¶ 25        Furthermore, respondent-mother argues that the trial court erred by stating in Finding of Fact No. 23 that she had "had altercations with a boyfriend in May 2020, July 2020, July [sic] 2020 and September 2020" on the grounds that the record provided insufficient support for this finding. However, Mr. Colby testified that respondent-mother had utilized Open Gate to find housing in May, June, July, and September 2020, as the result of incidents in which she had been involved with a boyfriend and the guardian ad litem testified that, "a couple of times throughout 2020," respondent-mother sought shelter as the result of domestic violence

perpetrated by R.T.'s father. Thus, we hold that the record contains sufficient support for an inference that respondent-mother had "had altercations" with a boyfriend in May, July, and September 2020. *See In re A.L.*, ¶ 16; *In re A.R.A.*, 373 N.C. at 196.

¶ 26 In the same vein, respondent-mother challenges the sufficiency of the evidentiary support for the trial court's statement in Finding of Fact No. 27 that she had "acknowledged the need for medication management" during her 1 May 2019 psychological evaluation. As we read the relevant portion of the record, while respondent-mother did acknowledge a general need for treatment on that occasion, there is no evidentiary support for the trial court's determination that respondent-mother had acknowledged a need for medication management at that time. For that reason, we will disregard the challenged portion of Finding of Fact No. 27 in evaluating the extent to which respondent-mother's parental rights in Marco were subject to termination. *In re J.M.J.-J.*, 374 N.C. at 559.

¶ 27 Similarly, respondent-mother argues that the trial court erred by determining in Finding of Fact No. 29 that respondent-mother had "failed to consistently address her mental health needs throughout [Marco]'s case." According to respondent-mother, the undisputed record evidence demonstrates that she sought out and received services for the purposes of addressing her mental health difficulties. We note, however, that respondent-mother has failed to challenge the sufficiency of the evidentiary support for the trial court's findings that "[she] was diagnosed with

Intermittent Explosive Disorder several years ago," that DSS had provided services to respondent-mother for the purpose of addressing her mental health problems in May 2018, and that, "[a]t the time of [Marco]'s removal [in February 2019], [respondent-mother] was not participating in medication management or therapy to address her mental health issues."

¶ 28        The record further reflects that the trial court had directed respondent-mother to complete a psychological evaluation and comply with any and all treatment recommendations in its initial adjudication and disposition order and that Dr. Lecci's subsequent report indicated that respondent-mother suffered from bipolar II disorder and a long-standing mood disorder. According to Dr. Lecci, respondent-mother should receive a medication assessment relating to her bipolar II disorder and might benefit from a behavioral intervention other than "traditional psychotherapy" and the availability of a social support network. Although Dr. Lecci observed that respondent-mother's behavioral issues had previously been treated with anti-psychotics, "which would have a sedating effect and could have minimized the consequences of both psychiatric instability and attention deficits," the trial court found that, "at the time of the [1 May 2019] evaluation and for months thereafter, [respondent-mother] failed to take medication to address her mental health issues."

¶ 29        In addition, the record contains evidence tending to show that respondent-mother had begun to receive treatment at PAMH in January 2020 "and then there

[had been] a large period of lull maybe in part [due to] the pandemic" before respondent-mother re-engaged with PAMH in June or July 2020. As a result, respondent-mother began receiving medication management services and participated in a psychiatric evaluation at PAMH in October 2020, which was only four months before the termination hearing was held. Thus, in light of the extensive evidence describing the nature and extent of respondent-mother's episodic participation in recommended mental health treatment, we hold that the record provides ample support for the trial court's finding that she "failed to consistently address her mental health needs throughout [Marco]'s case." *See In re A.L.*, ¶ 16.

¶ 30        Respondent-mother also argues that the trial court's statement in Finding of Fact No. 31 that "[m]uch of PAMH staff's time with [respondent-mother] revolves around crisis management" lacks sufficient record support. At the termination hearing, Ms. Dest acknowledged that, when respondent-mother first sought assistance from PAMH in January 2020, it was "dealing with her housing crisis." In addition, Ms. Dest explained that, while respondent-mother's "service definition allow[ed] up to four hours per week of any type of service delivery[,] . . . in circumstances in which there are needs such as housing or crisis, we do have the ability to engage more frequently to address and to assist in individual stabilizing." According to both Ms. Dest and respondent-mother, respondent-mother contacted PAMH on a daily basis during this period, with Ms. Dest having stated that PAMH

"maximize[d] [its] time with [respondent-mother]." Moreover, Ms. Dest described respondent-mother as having a "propensity for impulsive decisions without thinking about the potential consequences" and stated that "we're still at a phase in which we want to continue to support [respondent-mother] in lowering that stress level so it provides us an opportunity to do something different; to make other decisions." Finally, Mr. Colby testified that, as of mid-September 2020, PAMH was "only mitigating crisis [sic] at the time." As a result, we have no difficulty in concluding that the trial court's finding that PAMH's work with respondent-mother "revolves around crisis management" constituted a reasonable inference from the record evidence. *See In re A.R.A.,* 373 N.C. at 196.

¶ 31        Next, respondent-mother argues that the trial court's statement in Finding of Fact No. 38 that respondent-mother was "verbally abusive to [Marco] during at least seven visits [she] attended" had insufficient support in the record evidence. As an initial matter, respondent-mother contends that the record does not contain any evidence indicating the number of occasions upon which she was verbally abusive to Marco. However, the trial court found in the 30 November 2020 permanency planning review order that "[respondent-mother] was observed being verbally abusive to [Marco] during seven of the last sixteen visits attended." *See In re A.C.,* ¶ 17. In addition, after acknowledging that the record contained evidence tending to show that she had called Marco "fat," "weak," and "soft," respondent-mother contends

that the trial court's description of her conduct as "verbally abusive" constitutes "an improper conclusion of law, to the extent it is a determination that [respondent-mother] abused her son," with "it def[ying] reason to conclude that conduct such as this could possibly rise to the level of abuse, given that parents have a constitutionally protected right to physically punish their children hard enough to leave a bruise." We do not, however, interpret the trial court's reference to "verbal abuse" as any sort of shorthand assertion that respondent-mother's comments sufficed to make Marco an "abused juvenile," s*ee* N.C.G.S. § 7B-101(1) (2019) (defining "abused juvenile," in part, as a juvenile "whose parent . . . [c]reates or allows to be created serious emotional damage to the juvenile" as "evidenced by a juvenile's severe anxiety, depression, withdrawal, or aggressive behavior toward himself or others"), although Mr. Colby did testify that, while respondent-mother's descriptions of Marco as "soft," "a crybaby," and "fat" could have been said "jovially, in a joking manner," those statements were, in actuality, "part of an escalation of frustration." Thus, we hold that the trial court's finding concerning the number of occasions upon which respondent-mother made inappropriate comments to Marco and its description of those statements as "verbal abuse" had ample record support. *See In re A.R.A.*, 373 N.C. at 196. As a result, after carefully examining the record, we hold that some of respondent-mother's challenges to the trial court's findings have merit and will disregard the relevant findings in determining whether the trial court's findings of

fact supported its determination that respondent-mother's parental rights in Marco were subject to termination.

## B. Neglect

Subsection 7B-1111(a)(1) provides that a trial court is authorized to terminate a parent's parental rights in his or her child in the event that the child is a neglected juvenile as that term is defined in G.S. 7B-101. N.C.G.S. § 7B-1111(a)(1) (2021). According to N.C.G.S. § 7B-101(15) (2019), a neglected juvenile is, among other things, one "whose parent . . . does not provide proper care, supervision, or discipline . . . or who lives in an environment injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15) (2019).[4]

---

[4] The General Assembly amended the definition of a "neglected juvenile," N.C.G.S. § 7B-101(15), by enacting Session Law 2021-132, effective 1 October 2021, with the new definition being applicable "to actions filed or pending on or after that date." Act of Sept. 1, 2021, S.L. 2021-132, § 1(a), 2021 N.C. Sess. Laws 165, 165, 170. As a result, the definition of a "neglected juvenile" now encompasses:

> Any juvenile less than 18 years of age . . . (ii) whose parent, guardian, custodian, or caretaker does any of the following:
>> a. Does not provide proper care, supervision, or discipline.
>
> . . . .
>
> e. Creates or allows to be created a living environment that is injurious to the juvenile's welfare.

N.C.G.S. § 7B-101(15) (2021).

¶ 33      A court may terminate a parent's parental rights in a child based upon neglect occurring at the time of the termination hearing. *See, e.g., In re K.C.T.*, 375 N.C. 592, 599–600 (2020) (stating that "this Court has recognized that the neglect ground can support termination . . . if a parent is presently neglecting their child by abandonment"). On the other hand, in the event that the child has not been in the parent's custody for a significant period of time prior to the termination hearing, a decision to "requir[e] the petitioner . . . to show that the child is currently neglected by the parent would make termination of parental rights impossible." *In re N.D.A.*, 373 N.C. 71, 80 (2019) (quoting *In re L.O.K.*, 174 N.C. App. 426, 435 (2005). In such circumstances, a trial court is entitled to consider "evidence of neglect by a parent prior to losing custody of a child — including an adjudication of such neglect" — along with "any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect." *In re Ballard*, 311 N.C. 708, 715 (1984). "When determining whether such future neglect is likely, the district court must consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing." *In re Z.V.A.*, 373 N.C. 207, 212 (2019) (citing *In re Ballard*, 311 N.C. at 715).

¶ 34      In its termination order, the trial court determined that respondent-mother had neglected Marco and that "the likelihood of repetition of neglect [was] high." Although respondent-mother does not challenge the validity of the trial court's

conclusion that she had neglected Marco in the past, she does argue that the trial court's findings failed to support a conclusion that she was likely to neglect Marco in the future. According to respondent-mother, the trial court's findings show that she made reasonable progress in satisfying the requirements of her case plan and that the amount of progress that she made suffices to preclude a determination of future neglect. We do not find respondent-mother's argument persuasive.

¶ 35        "A parent's failure to make progress in completing a case plan is indicative of a likelihood of future neglect." *In re S.R.F.*, 376 N.C. 647, 2021-NCSC-5, ¶ 25 (quoting *In re M.A.*, 374 N.C. 865, 870 (2020)). On the other hand, however, "[a]s this Court has previously noted, a parent's compliance with his or her case plan does not preclude a finding of neglect." *In re J.J.H.*, 376 N.C. 161, 185 (2020) (citing *In re D.W.P.*, 373 N.C. 327, 339–40 (2020) (noting the parent's progress in satisfying the requirements of her case plan while upholding the trial court's determination that there was a likelihood that the neglect would be repeated in the future given that the parent had failed "to recognize and break patterns of abuse that put her children at risk")). A careful review of the record satisfies us that the trial court had ample justification for finding a likelihood of future neglect in the event that Marco was returned to respondent-mother's care.

¶ 36        The case plan that respondent-mother entered into with DSS and with which the trial court ordered respondent-mother to comply included completing a

psychological evaluation and following "any and all recommendations," obtaining and maintaining stable housing and verifiable employment, and submitting to random drug screens as requested. As the trial court's findings of fact reflect, respondent-mother failed to consistently address her mental health needs throughout the period of time during which Marco remained in foster care and continued to struggle with mental health issues at the time of the termination hearing. At the time of Marco's removal from her home, respondent-mother was not participating in medication management or therapy despite the fact that such services had been recommended in her clinical assessment. Although respondent-mother had acknowledged her need for assistance and the efficacy of taking psychotropic medications, she did not take her prescribed medication "for months" following her evaluation and did not consistently take the prescribed medication for the majority of the interval between Marco's placement in foster care and the date of the termination hearing. Similarly, respondent-mother failed to engage with PAMH until eleven months after Marco entered foster care and did not obtain a psychiatric evaluation from and participate in medication management with PAMH until October 2020. According to a comprehensive clinical assessment that PAMH completed less than a week before the termination hearing began, respondent-mother suffered from "Post Traumatic Stress Disorder, Intermittent Explosive Disorder, Major Depressive Disorder, recurrent, moderate, Generalized Anxiety Disorder, Cannabis Use Disorder, mild, Unspecified

Housing or Economic Problem, Other Problem Related to Employment, Academic or Educational Problems and Unspecified Problem Related to Social Environment." As a result, the trial court's findings reflect that respondent-mother had failed to adequately address the mental health problems that contributed to Marco's placement in foster care.

¶ 37          Similarly, respondent-mother failed to maintain safe and suitable housing or verifiable employment for any significant portion of the time after Marco's removal from her home. At the time of the termination hearing, respondent-mother was behind on her rent payments, was seeking alternative housing and lacked employment, with nothing in the present record tending to show that respondent-mother's inability to care for Marco stemmed solely from respondent-mother's poverty. In addition, respondent-mother's continued struggles with domestic violence had caused her to lose employment and independent housing within six months of the termination hearing. Finally, respondent-mother failed to submit to several requested drug screens in accordance with the requirements of her case plan. Thus, for all of these reasons, we hold that the trial court's order refutes respondent-mother's contention that she had made reasonable progress in satisfying the requirements of her case plan as of the date of the termination hearing.

¶ 38          As part of her challenge to the trial court's finding of a likelihood of future neglect, respondent-mother argues that the trial court's findings of fact relating to

the issue of domestic violence fail to support the trial court's determination that future neglect of Marco was likely and that the trial court's determination that domestic violence constituted a barrier to respondent-mother's reunification with Marco was not relevant to the making of its termination decision given that concerns about domestic violence had not been a part of the basis for the trial court's original decision to adjudicate Marco as a neglected juvenile and given that domestic violence-related concerns had not been mentioned in respondent-mother's case plan, her psychological evaluation, or any prior court order. According to respondent-mother, "[a]ny past domestic violence was simply never serious enough to compel [DSS] or the court to require [her] to specifically address it in this case." We do not find respondent-mother's domestic violence-related argument to be persuasive.

¶ 39        "Termination of parental rights proceedings are not meant to be punitive against the parent, but to ensure the safety and wellbeing of the child." *In re D.W.P.*, 373 N.C. 327, 340 (2020) (citing *In re Montgomery*, 311 N.C. 101, 109 (1984) (recognizing that the determinative factors in deciding whether a child is neglected are the circumstances and conditions surrounding the child rather than the culpability of the parent)). At a hearing held in a proceeding in which a parent's parental rights in a child are sought to be terminated on the basis of neglect pursuant to N.C.G.S. § 7B-1111(a)(1), "the trial court must admit and consider all evidence of relevant circumstances or events which existed or occurred either before or after the

prior adjudication of neglect." *In re M.A.W.*, 370 N.C. 149, 153 (2017) (emphasis omitted) (quoting *Ballard*, 311 N.C. at 716). For that reason, even if domestic violence-related concerns had not constituted a basis for the trial court's initial determination that Marco was a neglected juvenile, the trial court was required to consider respondent-mother's domestic violence problems in determining whether Marco was likely to suffer a repetition of neglect if he was returned to respondent-mother's care. *See generally id.* at 153–54 (affirming the termination of the respondent-father's parental rights in a case in which the adjudication of neglect was based upon the mother's conduct prior to the establishment of the respondent-father's paternity and the conclusion that the juvenile was likely to be neglected in the future was supported by respondent-father's long history of criminal activity and substance abuse); *In re C.L.S.*, 245 N.C. App. 75 (affirming the termination of a father's parental rights on the basis of neglect in a case in which the father was incarcerated and paternity had not been established until after a prior adjudication of neglect that rested upon substance abuse by the mother), *aff'd per curiam*, 369 N.C. 58 (2016). As a result, even if concerns related to the domestic violence in which respondent-mother was ensnared had not helped precipitate the initial adjudication of neglect, those concerns could still support a determination that future neglect was likely in the event that Marco was returned to respondent-mother's care.

¶ 40        In addition, domestic violence-related concerns did contribute to Marco's adjudication as a neglected juvenile and the fact that Marco had remained in foster care from the entry of the nonsecure custody order until the date upon which the termination hearing was held.  As the record reflects, respondent-mother stipulated to a history of domestic violence that preceded Marco's placement in foster care in advance of the initial adjudication order.[5]  Moreover, the record reflects that Marco was taken into DSS custody after an incident of domestic violence occurred at the home of a relative at a time when Marco and his siblings were present, with respondent-mother having been placed under arrest for, among other things, violating a domestic violence order of protection at the conclusion of that incident. On the same day, a social worker approached respondent-mother for the purpose of discussing her "continuing domestic violence issues."  In its termination order, the trial court found that respondent-mother "has a history of abusive relationships with the fathers of her children" and that her relationship with R.T.'s father had been "riddled with domestic violence" since R.T.'s birth in August 2020, which was only six months prior to the termination hearing.  In addition, the trial court found that

---

[5] We do not wish to be understood as implying that the fact that respondent-mother was a victim of domestic violence, without more, supports a determination that her parental rights in Marco were subject to termination on the basis of neglect.  Although the record in this case contains evidence tending to show that respondent-mother was both the victim and perpetrator of domestic violence, the trial court's neglect-related findings appropriately focused upon problematic conduct on the part of respondent-mother rather than upon the fact that respondent-mother was the victim of domestic violence.

respondent-mother "has a severe and persistent mental illness that affects her functioning during periods of psychiatric deterioration," that "[h]er mood is easily affected by any change she experiences," and that "she has a propensity to react strongly and out of proportion to triggering events." Simply put, the trial court's determination that domestic violence remained a barrier to the success of any efforts to reunify respondent-mother with Marco has ample evidentiary support and reflects nothing more than a recognition that respondent-mother's struggle with domestic violence-related problems constituted an ongoing obstacle to her ability to reunite with Marco. *See In re M.A.W.*, 370 N.C. at 153.

¶ 41  Finally, the trial court found that respondent-mother had failed to consistently and appropriately participate in visitation with Marco and that DSS had been unable to expand the "frequency, duration or level of supervision due to [respondent-mother]'s lack of progress." Aside from the fact that respondent-mother only attended half of her scheduled visits with Marco, she was "unable to appropriately parent for [a] two hour[ ] [visitation period,]" having mocked and verbally abused Marco during certain of the visits that she did attend.

¶ 42  Thus, the trial court's findings that respondent-mother had failed to make adequate progress in satisfying the requirements of her case plan, that respondent-mother had persistent domestic violence-related problems, and that respondent-mother had failed to demonstrate the ability to employ appropriate parenting skills

provide ample support for the trial court's conclusion that that there was a high likelihood that the previous neglect that Marco had experienced would be repeated in the event that Marco was returned to respondent-mother's care. *See In re M.Y.P.*, 378 N.C. 667, 2021-NCSC-113, ¶¶ 19–20 (concluding that "the trial court properly determined that there was a high probability of a repetition of neglect" based, in part, upon the parent's failure to consistently visit with the child and to address issues of housing and substance abuse); *In re J.J.H.*, 376 N.C. 161, 185–86 (2020) (concluding that there was a likelihood of future neglect given that the parent's housing, although stable, was not appropriate for the children; that the parent "had missed at least twenty-two scheduled visits"; and that the parent had failed to interact appropriately with the children during visits).[6]  As a result, since the trial court's properly supported findings demonstrate that respondent-mother's parental rights in Marco were subject to termination on the basis of neglect, N.C.G.S. § 7B-1111(a)(1), and since respondent-mother has not challenged the validity of the trial court's determination that the termination of respondent-mother's parental rights would be

---

[6] As a result of the fact that "an adjudication of any single ground for terminating a parent's rights under N.C.G.S. § 7B-1111(a) will suffice to support a termination order," *In re M.S.*, ¶ 21, we need not address the validity of respondent-mother's challenge to the trial court's determination that her parental rights in Marco were subject to termination on the ground that she had willfully failed to make reasonable progress toward correcting the conditions that had led to Marco's removal from her home pursuant to N.C.G.S. § 7B-1111(a)(2).

in Marco's best interests, N.C.G.S. § 7B-1110(a), the trial court's termination order is affirmed.

AFFIRMED.